Ryan S. Riddles, counsel for appellant Vance Zachary Johnson, Melissa S. Hayward, counsel for Applee Bankers Healthcare Group. Okay, Mr. Riddles, you want to reserve a little time? Yes, your honor. Two minutes, please. Two minutes. Okay. And I'll give you the same caveat I gave Mr. Aver. I'll do my best to give you a high sign or something when you're at two minutes, but it's on you ultimately. Okay?  Thank you, your honor. Thank you. May it please the court. Good morning, your honors. Ryan Riddles with Go4Sython Hodges on behalf of appellant Dr. Vance Zachary Johnson. The bankruptcy court committed clear error in its finding that Dr. Johnson's debt to BHG is non-dischargeable for at least four reasons. First, the bankruptcy court erred to Dr. Johnson's prejudice in admitting the 341A examination transcript over proper objections on the grounds of authentication and hearsay. The transcript was decidedly foundational to the court's erroneous findings. Second, Can I stop you there for a second? How foundational does it have to be? I think there's an argument that it, you know, it certainly wasn't ignored, but was it, I mean, what else could it be for us to determine that it's prejudicial? I mean, there was, we'll hear from maybe the appellee, there were plenty of other reasons to end up where the bankruptcy court did here. Well, I think that it was foundational. There are numerous references in the court, in the bankruptcy court's memorandum. For example, footnote three, we've got another fact in terms of when Dr. Johnson's practice shut down within five weeks of the loan funding that was pulled. In fact, there's a quote in the memorandum directly from the 341A transcript. Well, do you need that 341A transcript to know when they shut the practice down? Well, that's what is cited in the memorandum. So that's not otherwise knowable? Not that I've seen in the record. Okay. Well, is there an argument that he didn't shut down then, or is it just nobody knew Well, it's just that BHG did not prove, did not show that at trial, apart from the 341A transcript. Okay. By the way, we've lost your video. Oh. Is it coming up? Not yet. I'm not trying to take your time, so we'd love to have your video, but I, no. I apologize. I'm going to see if it's going to come up. Okay. In the meantime, I'll proceed if that's... There you go. Now we have you again. Okay, great. Second, the bankruptcy court erred in finding that the statement of intended purpose was false when made. The court's findings are... Actually, are you going to come back to these in more depth, or should we ask you questions about them as you go? I plan on coming back in more depth. Okay, sorry. So I think that... Yeah, go ahead. The court correctly concluded that the representation that the loan proceeds were going to be used for primarily business purposes did not satisfy 523A2A. But then the court inexplicably found that the phrase regarding practice expansion was somehow more restrictive. The court erroneously found that this statement was false when made in the face of the finding that BHG failed to show the disposition of greater than 50% of the loan proceeds. Third, BHG as a sophisticated lender could not have reasonably relied on the statement of intended purpose. BHG required Dr. Johnson to pay greater than $150,000 of personal tax liability directly out of the loan proceeds, which is decidedly not for the purpose of practice expansion, thereby further underscoring the court's strained interpretation of practice expansion in which it read exclusively where exclusively does not exist. Fourth, the bankruptcy court erred in finding that Dr. Johnson made a materially false representation regarding the amount of debt at the time of the loan. Turning back to my first point regarding the 341A examination, that examination was not taken before an officer qualified to administer as required by FRCP 28. Did you make that argument in the bankruptcy court? I don't know if we specifically... I don't know if you did either. Rule 28? Yeah, I'm not sure you did either, but so, you know... But the court did treat it as a deposition, and we certainly... That's a different question. And we certainly objected on the grounds of authentication and... Okay, we'll deal with that, okay. Yeah, that directly dives into authentication, so I don't think that that argument... That's a different question, but go ahead. Well, let's start with this. Why is the hearsay? Well, because there's supposed to be out-of-court statements offered for the... Is there no exception to it? There could be an exception, except that we don't get there because it wasn't authenticated in the first instance. But that's a whole other question. I mean, putting that aside, putting aside the authentication issue, it's not hearsay, is it? Well, if it was authenticated, then yeah, it could be an exception in terms of... Okay, so if we find authentication, it's not hearsay? Sure, yes. Okay. And if you look at the transcript on the very last page, it contains a purported certificate. That is ER 1108. But the certificate does not comply with FRCP 30-F because the certificate was not made by an officer authorized to administer oaths. And nowhere is there certification that the witness was duly sworn. This was not made contemporaneously with the examination. It was made, I believe, six months following the examination by an entity based out of Arizona. There is no... Basically, the certificate is just a signature by whoever transcribed it who was not an officer, and I don't think that BHG disputes that. Simply put, the document could be anything. The fact that BHG claims that the document is what they say it is, is of no import because of the lack of certificate. An authorized officer is the only person with personal knowledge sufficient to authenticate the transcript. The court erred in finding that Dr. Johnson made a misrepresentation to BHG in the statement of intended purpose. If you turn to the statement of intended purpose, the first paragraph specifically provides that the loan was a commercial loan for use primarily other than personal, family, or household purposes. BHG did not show where greater than 51% of the proceeds went. They simply did not. The court recognizes that fact in its memorandum. Didn't the court comment that your client was unable thoroughly to account for any of it that went to a business purpose? The court did note that. Isn't that a bit of a problem? No, I don't think that's a problem, Your Honor, because it wasn't my client's burden to show where those proceeds went. BHG did not show where greater than 51% of the proceeds went. It's our position that if there was a representation in the statement of intended purpose, BHG did not show that Dr. Johnson acted otherwise than in conformance with the representation concerning the loan proceeds. Let's be clear. There are two separate issues here about the representations, and they're actually quite different. We'll get to that in a moment. Your client was directly asked where the money went, wasn't he? Didn't he say, I think it went to the practice, but there was never anything like an accounting of that? Isn't that accurate? I think that is close to what the answer was. Yes, but BHG, and as the court recognized, did not show where that 51% went. Well, there's two different things going on here, so let me just jump to the next point because I think you're about to get there. There's a difference in my mind between the check the box thing that was in the application. This is a commercial loan. It's going to be used primarily not for consumer purposes, which is BHG's requirement, and then the requirement that your clients say where the money is going to go for, which was his affirmative statement, wasn't it? Well, it was a statement that was prepared by BHG, and both of those statements... Wait, did they make up practice expansion? Was that their statement or your client's? Well, it was their statement that my client subscribed to. Really? In other words... All right, well, in any event, you can certainly see why there's a little bit of a difference there between a specific statement by your client, even if merely a sentence to, and the general statement, this is a commercial loan. You're finding an inconsistency there, and I am not with you at all on that. I mean, they're night and day differences. Well, I see what your honor is getting at, but they are both contained on the exact same document. One is in the first paragraph. The other is in the third paragraph. Well, somehow the general controls the specific here? Well, I think that that's not exactly the way that we look at it. Well, no doubt, but you're trying to tell me there was a mistake made, and the argument is it's a mistake because this general statement argued, the court found the general statement was not problematic. The court found the specific statement was problematic. So tell me why that's a mistake. Well, even looking from your honor's perspective in terms of the general and then... By the way, I don't have a perspective here. I'm not arguing with you. I'm deciding this with my colleagues. And then in terms of the specific statement, I think that it just specifies the general statement in terms of where the loan proceeds are primarily going to go. And even if 49% of the proceeds went to anything other than practice expansion, then that would still comply with the representation made in the statement of intended purpose. And even more importantly, BHG is a sophisticated lender. They knew, in fact, they required that 150,000 of the approximately 500,000 in loan proceeds go to a personal purpose, which was to pay off Dr. Johnson's IRS debt. Well, yeah, like any smart lender, once they realize your client hasn't told them about a tax liability, they say, why don't you pay that so it's not in front of us, right? Right. But that destroys reliance on the fact that they still expected the money to be spent for practice expansion? That destroys reliance in terms of anything in excess of primarily in terms of if Dr. Johnson used 51% of the proceeds for practice expansion, then he would comply with it. And BHG could not possibly rely on some type of exclusive representation. They don't have to. That's not the standard. Right. But we think that that was the standard that the court imputed in its memorandum. Okay, well. Okay. And I'll cite to ER 1029, where the court specifically found that plaintiff has not established what the majority of the loan proceeds were used for. And that's despite Dr. Johnson's use of 150,000 of the proceeds to pay off his personal debt to the IRS. And finally, the banker and I will reserve the. Yeah, you're right about extra two minutes. So, yeah, I'll reserve the rest of my time. Okay, thank you. You know, you're on mute, Ms. Hayward. I hate that. Yes, I had the mute on my phone, Your Honor. I'm not the 5 millionth person to say that on a Zoom call. But, yeah, there you go. That's the catchphrase of 2020 onward. Yeah, I'm afraid so. You're on mute. Yeah, I'm afraid so. Your Honor, Melissa Hayward here on behalf of Bankruptcy Healthcare Group. It's an honor to be in front of Your Honors today. I've never argued in front of a bat before. I practice primarily in the Northern District of Texas, where we do not have a bankruptcy appellate panel. Right. So it's very refreshing to be able to argue and appeal in front of these bankruptcy judges. Well, I mean, those judges do so. But, yeah. Who are well aware of bankruptcy rules and law. Your Honors, I'm probably not too far off in saying this is probably one of the first times Your Honors have considered an appeal on an authentication issue with respect to a 341 transcript. It's an interesting issue that Dr. Johnson has attempted to argue here as an evidentiary erroneous ruling. Well, can you start with something that I raised? I think there are some arguments here that may not directly have been made in the bankruptcy court, which is going to be a problem for us. If you agree with that, could you just let us know that? Yes, Your Honor. There are many arguments that were made in the response of pleadings and the briefing here that were not made, and frankly, some of which were not accurate. First off, Dr. Johnson argues that there can be no reliance here because BHG did a UCC research and therefore saw the Premier Pacific loan, the UCC filing. That's not in the record, Your Honor, and I will submit to Your Honors that that's actually false. The Premier Pacific loan was against a different entity than the entity that BHG was loaning money to. So that statement is wholly unsupported in the record. There is no evidence that BHG ever saw UCC filing by Pacific Premier Bank. Also, there is no evidence in the record and was not argued many of these authentication issues, such as whether or not there was a seal and those types of issues. So I would agree with Your Honors that those issues were not brought up. And if Your Honor actually looks to the record and the trial transcript, Your Honor, would see that ultimately most of these objections were actually withdrawn with respect to the 341 transcript. I'm sorry, Your Honor, I'm getting a little bit of feedback. Yeah, we are too. If somebody is talking at this point, if you're not addressing the court, can you mute yourself, please? I believe Mr. Remsen is not on mute. Okay, Mr. Remsen, put yourself on mute. Thank you. Now, Your Honors. Go ahead. Thank you, Your Honors. Your Honors started also by stating that there were plenty of other reasons to end up where the bankruptcy court did outside of this 341 transcript. And Your Honors are absolutely correct in that analysis. I would also point out to Your Honors that the fact that this business shut down a few weeks after the loan was funded was actually a stipulated fact in the pretrial stipulation. And I'll point Your Honors to the record ER1111, which shows that that was a stipulated fact. There's no question here. The bankruptcy court did not err in deciding that Dr. Johnston had no intention of expanding his practice at the time he borrowed this money from Bankers Healthcare Group. Can I stop you for a second? Yes, Your Honor. None of this is direct as it might be because when we're talking about fraud, we're almost always talking about inferences and indirect proofs, right? So it's circumstantial. But a large part of Mr. Riddle's argument, certainly a large part of the circumstantial evidence, Ray, the purpose of the loan and the practice expansion issue would be derived from the 341 testimony where I think it was admitted or whatever the right verb would be, that in fact, those issues have been decided significantly before and there was not going to be the expansion that was described otherwise. Is that fair? Yes and no, Your Honor. I think that the court certainly did rely on that portion of the 341 testimony that his expansion efforts had ceased a year before. The court also relied on the fact of how the money was spent, that it went to child support almost immediately, that the business shut down five weeks later. And most importantly, the most insurmountable hurdle that Dr. Johnston has here is that the bankruptcy court found he wholly lacked credibility. And Dr. Johnston tried to explain on his direct what he was doing to try to expand the practice and the bankruptcy court said, no, I don't believe you. Well, can you deal with sort of the fundamental argument Mr. Riddle's is making that somehow it was your burden to show where every dollar of this went and that if you can't do that, you can't prevail on 523A, whatever? Sure, Your Honor. It is not bankers' healthcare burden to show that every dollar was spent either toward a commercial purpose or for practice expansion. But the record here is clear that there is no evidence that any dollar was spent on practice expansion. In fact, the record here is clear that there was no practice expansion for all of the reasons I just stated. Number one, Dr. Johnston's lack of credibility, his evasiveness on the stand. Number two, the practice being shut down within five weeks of the loans funding and the various representations. At the end of the day, Dr. Johnston presented himself to Bankers' Healthcare Group as a successful doctor who ran successful businesses and that was a false narrative that was presented to the bank who at the time made loans to doctors. Of course, Bankers' Healthcare Group is going to make a loan to a doctor who says he's expanding his practice, looking at the revenue of these businesses and the tax transcripts for years and is being presented with a successful doctor who has a successful practice. That clearly was not the case and Dr. Johnston shut down the business, the very business and let's remember, the business that borrowed the money, TVPMG, is the business that shut down. This was not a loan that Dr. Johnston obtained in his individual name. He obtained it for and on behalf of his entity that he had no intention of continuing to operate, that he had no intention of expanding that practice and that's what the Bankruptcy Court found. And that finding is not just limited to the 341 transcript. That finding is based on the record before the court in its entirety, including stipulations that the business shut down several weeks after the loan was funded. The lack of credibility of Dr. Johnston, his evasiveness on the stand, the fact that he could not explain how the money was spent. The record is replete with facts that were not clearly erroneous and the plaintiff, Dr. Johnston, has a very high burden here and he cannot meet it. He cannot meet it in this instance, in this case. He also argues about the reliance of Bankers Healthcare Group. I think your honor hit that on the head with respect to the IRS. Of course, a lender and this was explained by BHG's witness at trial. Of course, a lender is not going to loan money when there is a, with a security interest because BHG did require security and did have a security agreement and a blanket lien on all of the assets of this business. And once BHG discovered that tax lien, of course, it was going to require that the taxes get paid. And that doesn't negate reliance. If anything, it supports reliance because it shows that BHG was very concerned at that from that discovery about the debt to income ratio. And that's why it required that that money be paid to the IRS to clear that obligation such that the doctor based upon his financial statements, based upon his written documents that he submitted to BHG, that the doctor would be able to afford this loan and continue to make those payments. And more importantly, that TVPMG, the entity, which BHG had no reason to believe was not going to be a knowing concern for much longer. This doctor, Dr. Johnson clearly made misrepresentations to Bankers Healthcare Group in order to obtain this loan. And the bankruptcy court did not err in finding the loan to be non-dischargeable under either 523 A2A or A2B. So we basically have two issues here. We have the statement that it was being obtained for practice expansion. And then we have the misrepresentations in the financial statement whereby Dr. Johnson did not disclose the significant amount of debt that he had on his personal shoulders in that financial statement. And the bankruptcy court did not err in finding that those were misrepresentations that supported a non-dischargeability finding here. With respect to the debt, one of the issues that have been raised in the appellate brief is that the court considered proofs of claims of which he had taken judicial notice of and that he was taking into consideration the contents of those claims. I would respectfully disagree, Your Honors. The debtors' schedules, which were signed under penalty of perjury and which if Your Honors reviewed the transcript, the debtor wouldn't even admit that he knew what they were, which I think is really what killed the debtor's credibility with the bankruptcy court. When the debtor got on the stand and was asked about the schedules and said he didn't know what those were, I think that was it. But the schedules that were filed in this case disclosed debt to Premier Pacific Bank, disclosed tax debt to the state taxing authority. None of those were disclosed on the financial statement that was submitted to BHG. And the testimony was clear from BHG's witness that had BHG known about those debts, it would have thrown the DTI off and BHG would not have made that loan. Had BHG known that TVPMG was not actually a going concern anymore or that the doors were going to shut in five weeks. Had BHG known that Dr. Johnston owed back child support and the bankruptcy court, another point in the appellate brief that was made was that the bankruptcy court somehow construed a short amount of time between the funding of the loan and the payment of child support. I would submit to your honors that seven days after funding is not a terribly difficult analysis to make that, of course, Dr. Johnston owed back child support and spouse support at that time, considering the amount of the payment that was made a mere seven days after the loan funded from the very proceeds. Of course, and we also have the fact that Dr. Johnston directed Bankers Healthcare Group in a written document to deposit those funds into a personal bank account, which he claimed he used for the business. The evidence at trial showed that that bank account was established solely to receive those funds. And after most of the funds had been depleted, only then did BHG get directed to pull payments from a different bank account. So the record here is replete with misrepresentations. And it is certainly not erroneous for the bankruptcy court to derive from the record even if we don't include the 341 transcript that Dr. Johnston made a knowingly false misrepresentation to BHG in writing through the statement of intended purpose and in writing through his personal financial statement, but also not even in writing under 523A2A. Dr. Johnston obtained proceeds half a million dollars of money from Bankers Healthcare Group under the guise that he was a successful doctor with a thriving practice that was PVPMG. Those representations were false. And accordingly, BHG's debt is non-dischargeable and the bankruptcy court did not err. And Dr. Johnston cannot overcome the insurmountable burden and his error because of the fact that clear error that this court has to consider whether the bankruptcy court clearly erred with respect to omitting the 341 transcript, with respect to the bankruptcy court's findings of fact. The record clearly supports the bankruptcy court's findings of fact here. Well, if there's a serious argument about the admissibility of the transcript, that's not clear error, right? That's a question of lawsuits to know, isn't it? No, Your Honor, I think that a evidentiary objection is an abuse of discretion standard. Well, is it a question of fact? Well, I think it's a question of fact, Your Honor. Well, it's a question of fact as to what would support the admission, right? Right. And so let's talk about it for a second. Yeah, I was going to ask about that. Go ahead. So hold on. As I'm doing this, I'm pulling up my statutes here, Your Honor. Authentication should not be a terribly difficult burden, especially with respect to a 341 transcript. You have Rule 901 and you have Rule 902. Rule 902 deals with self-authenticating documents. Let's assume, argue and go here, that the 941 transcript is not self-authenticating. Then that takes us to 901. And how do we authenticate a document under 901? Testimony of a witness with knowledge, right? So to the extent that BHG testified at trial, we got an audio copy of the 341 meeting because that's how 341 meetings are held. We paid to have it transcribed. And here's the transcription we got with a certification at the end of that transcript. And how else could anyone ever put in evidence a transcript such as that? Let me ask you then. I mean, the point that Mr. Riddles is making is, well, that's not exactly the kind of certification that you might have with respect to a deposition. In your mind, that's neither here nor there? Yes, Your Honor. That's neither here nor there. I'm not even sure. The court found and looked to Rule 32 as this being a deposition. Whether that's accurate or not, perhaps it's probably the closest thing to a deposition. Of course, the 341 meeting is statutory, right? It's something that the Bankruptcy Code mandates that happen. And it did have an officer who swore the debtor in, that being the trustee. The United States trustee, or I guess here it would be the Chapter 7 trustee, swore in the debtor. Who to their purpose is the right person to do it, right? Correct. Correct, Your Honor. There's nobody else to do it. So this argument that the 341 transcript shouldn't come in and was inauthentic, I would also point out that the rules also show that you can look to the contents of the document to see whether it's authentic or not. The allegation that Bankrupt Healthcare Group somehow created this document that is multiple tens of pages of testimony of the debtor at a 341 meeting simply doesn't pass muster here, Your Honor. The arguments with respect to the 341 transcript are simply desperate attempts to keep testimony out that did not help Dr. Johnson. And with that, Your Honor, I see that I have spoken for my entire 15 minutes. I appreciate Your Honor's time and questions, and thank you. Thank you for the good arguments. Okay, Mr. Ramos, you've got about two minutes. Yes, I would like to address BHG's misapprehension of the authentication requirements. First, they're saying that this is a transcript because we asked for it and we received it six months later. But the problem is that they're getting a step ahead of themselves in terms of the authentication requirements of 901 or 902. The bankruptcy court admitted, or excuse me, the bankruptcy court correctly excluded a deposition transcript, which I believe was Exhibit 32 in the adversary proceeding at trial because it did not contain a certificate. I believe that, well, that ruling was correct, but the ruling in terms of the 341A transcript was not correct because what I think happened is the bankruptcy court just said, oh, there's a certificate. Okay, go ahead. But the problem there is that it was not before an authorized officer. We did not waive the authentication requirement that is clear from the quality between us and the court throughout. I mean, it was probably five or six pages in the transcript. And basically, the transcript, this document that they purport to be a transcript could be anything. And under Rule 32, if this was run-of-the-mill deposition transcript, it would obviously be errored to admit it based on the purported certificate in the record. Unless your honors have any further questions, then that will be it for me. I do not. Judge Gann? Good, thank you. Judge Spraker? No, thank you. Okay, well, you guys are amazingly timely. Congratulations. All right, well, we'll take the matter under submission. Thank you very much for your excellent arguments, and we'll get out a written decision as soon as we can. Thank you. Thank you, your honors. It's been a pleasure appearing in front of you today. Thank you.
judges: LAFFERTY, SPRAKER, GAN